FILED

SEP 05 2013

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP Nos.   NV-12-1643-KiCoD |
| ) | NV-13-1049-KiCoD |
| SUSAN GOODMAN, ) | (Consolidated) |
| ) | |
| Debtor. ) | Bk. No.   08-19036-MN |
| ———————————————————— ) | |
| ) | |
| RANDOLPH H. GOLDBERG, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[1] |
| ) | |
| SUSAN GOODMAN, ) | |
| ) | |
| Appellee. ) | |
| ———————————————————— ) | |

Argued and Submitted on July 19, 2013,
at Las Vegas, Nevada

Filed - September 5, 2013

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Mike K. Nakagawa, Bankruptcy Judge, Presiding

Appearances:   Christopher Burke argued for appellant Randolph H. Goldberg; Jeffrey P. Aylward argued for appellee Susan Goodman.

Before: KIRSCHER, COLLINS[2] and DUNN, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[2] Hon. Daniel P. Collins, Bankruptcy Judge for the District of Arizona, sitting by designation.

Appellant, Randolph Goldberg, Esq. ("Goldberg"), appeals the bankruptcy court's order imposing sanctions with respect to his representation of debtor, Susan Goodman ("Debtor"). Goldberg also appeals the related order awarding Debtor her attorney's fees. We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A.   Events leading to the motion for sanctions**

Goldberg runs a high-volume consumer bankruptcy practice in Las Vegas, Nevada, conducting approximately 250 consultations each week. After seeing a TV ad for Goldberg's bankruptcy services, Debtor met with Goldberg in May 2008, returning to his office in August 2008 to retain him. Goldberg filed Debtor's chapter 13[3] petition on August 12, 2008, and the matter was assigned to chapter 13 trustee, Rick Yarnall ("Trustee").

Debtor's petition did not include the required certificate showing her completion of credit counseling, resulting in a notice of Incomplete and/or Deficient Filing sent to both Goldberg and Debtor on August 13, 2008. On August 19, 2008, Goldberg filed the required certificate on behalf of Debtor ("CC Certificate"), indicating that she had completed credit counseling on August 11, 2008, at 5:29 p.m. EST.

Significant disagreement exists between the parties regarding what was discussed, what actions were taken, and what documents were signed at their initial meeting in May ("Meeting 1") and at their subsequent meeting (the "Retaining Meeting") in August. At

---

[3] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

Meeting 1, Debtor, accompanied by her former husband, Lonnie Goodman ("Lonnie"), appeared at Goldberg's office with various bills and receipts. Debtor testified that after she arrived, she went into a room and completed a small packet given to her by a woman at the front desk, requesting detailed information about her debts and creditors. After she completed the packet, Debtor testified that she and Lonnie met briefly with Goldberg. Goldberg discussed her debts, told her not to pay anyone for three months, and that the charge for representing her would be $700 — a reduced amount from the initial quote, because she had referred some clients to him. Debtor testified that she did not pay any money to Goldberg or sign a retainer agreement or any other documents at Meeting 1.

Debtor testified her second meeting with Goldberg, the Retaining Meeting, was in early or mid-August. She walked into Goldberg's office, paid the woman and asked to speak to Goldberg about a "loan remodification" — something she had just learned about. Debtor testified she was unable to sign any documents at this meeting because Goldberg was in a foul mood and threw her out. Although at some points in her testimony Debtor stated she had not signed any documents, Debtor also testified she signed a couple of pages when she was given the packet at Meeting 1. Additionally, Debtor could not describe precisely what was in the packet, but testified she was certain it did not contain an IRS Power of Attorney Form 2848 ("2848 POA").[4] Debtor was also

[4] IRS Form 2848, Power of Attorney and Declaration of Representative, is used to authorize another individual to
(continued...)

certain she had not completed a credit counseling class either online or by telephone. Further, Debtor testified the Retaining Meeting was the last time she had contact with Goldberg; all dealings thereafter were with his staff.[5]

---

[4](...continued) represent you before the IRS. The 2848 POA (Rev. December 1997) admitted by the bankruptcy court states, in relevant part:

> **Acts authorized**. The representatives are authorized to receive and inspect confidential tax information and to perform any and all acts that I(we) can perform with respect to the tax matters described on line 3, for example, the authority to sign any agreements, consents, or other documents. The authority does not include the power to receive refund checks (see line 6 below), the power to substitute another representative unless specifically added below, or the power to sign certain returns.

The instructions for IRS Form 2848 (Rev. June 2008) admitted by the bankruptcy court provide:

> **Authorizing your representative**.
> Write a statement on line 5 that you are authorizing your representative to sign your income tax pursuant to Regulations section 1.6012-1(a)(5) by reason of [enter the specific reason listed under (a), (b), or (c) under Authority to Sign your Return].
>
> **Authority to sign your return**.
> Regulations section 1.6012-1(a)(5) permits another person to sign a return for you only in the following circumstances:
> (a) Disease or injury,
> (b) Continuous absence from the United States (including Puerto Rico), for a period of at least 60 days prior to the date required by law for filing the return, or
> (c) Specific permission is requested of and granted by the IRS for other good cause.
>
> Authority to sign your income tax return may be granted to (1) your representative or (2) an agent (a person other than your representative).

[5] Debtor testified that after Goldberg yelled at her at the Retaining Meeting, she refused to go back to his office because she was too embarrassed. Instead, she sent Lonnie. Lonnie testified that he visited Goldberg's office between ten and fifteen times. Lonnie testified that he never signed Debtor's name on any documents, nor did he authorize Goldberg or anyone in Goldberg's office to do anything on behalf of Debtor.

-4-

Because Lonnie accompanied Debtor each time she went to Goldberg's office, he was present at both Meeting 1 and the Retaining Meeting. Lonnie testified that the first meeting was in May, and that he reviewed each page of the questionnaire filled out by Debtor. Lonnie further stated that the packet did not contain a 2848 POA form, or a form authorizing any request for a credit report, or any document allowing another party to sign documents on Debtor's behalf. Lonnie stated that the questionnaire was the only thing Debtor signed.

At a later hearing, Lonnie testified he was "absolutely positive" the first meeting occurred on August 11th, not May or June, and the second meeting was in October when Goldberg informed Debtor it would cost an additional $1,000 for a loan modification. Lonnie testified the packet was given to Debtor at the Retaining Meeting, not Meeting 1, and that he and Debtor were alone in a conference room when Debtor completed it. Lonnie also testified that no one asked them questions while working on a computer, nor were they ever in front of a computer.

When asked about his meetings with Debtor, Goldberg could not remember any specifics due to his 250 consultations a week, and he admitted that he had no personal knowledge of Debtor signing the disputed documents. Nonetheless, Goldberg thought Meeting 1 occurred in May or June 2008, and that Debtor would have filled out a consultation sheet with general information at that time. Goldberg stated that the Retaining Meeting was on August 11, although again, he stated it was impossible for him to remember his meeting with Debtor, because he "meet[s] with so many of them." Hr'g Tr. (Aug. 24, 2009) 149:6-7.

-5-

Despite his inability to remember specifics of the meetings, Goldberg testified he was certain of a few things based on his standard office procedures. Goldberg was confident that he only discussed the retainer agreement with Debtor at Meeting 1. Goldberg explained that his $5,000 fee is disclosed in the packet, but that he tells clients to bring in only the retainer portion. If he told them to bring in the entire $5,000 fee, "they would go somewhere else." Id. at 177:25-178:1. Goldberg also testified that Debtor would not have received the packet until after she had retained him; thus, not at Meeting 1. According to Goldberg, the only time a client got a packet was after payment of the retainer and after they have brought in the requested documents. "Until they get the appropriate documents and money, no one gets a packet ever." Id. at 179:12-13. Goldberg testified that on the same day a client retains and pays his fee, the client sits in a conference room and fills out all documents, signing where appropriate. This was the standard operating procedure for his office and it never deviated. Goldberg also stated that usually one or two people at the front desk oversaw the client to make sure all documents were signed, and, unless he expressly authorized differently, clients were required to sign all forms.

Elizabeth Allen ("Allen"), Goldberg's legal assistant for two years, testified that she handled all chapter 13 clients. Allen testified that she recalled Debtor signing all documents in the packet. On cross-examination, however, Allen admitted she did not have a master list for what documents were in the packet, that she did not know the exact number of pages in the packet as they were not numbered, and that no procedure or protocol existed for

-6-

confirming that every page was signed. Allen further testified that Adam Parmelee ("Parmelee"), Goldberg's paralegal/office administrator for ten years, was not present when Debtor signed the Tax Affidavit.[6]

When Parmelee testified, he shared Goldberg's difficulty remembering specific meetings with Debtor. "I can't recall. I mean, I met with her a couple of times . . . ." Hr'g Tr. (Oct. 5, 2009) 16:11. "Maybe one or two . . . ." Id. at 16:17. Contrary to Allen's testimony that Parmelee did not witness Debtor sign the Tax Affidavit, Parmelee testified that it was his signature and notary stamp on the document.

Debtor's § 341(a) meeting of creditors, held in September 2008, was attended by Debtor, an IRS agent and Parmelee. Debtor testified she was surprised Parmelee appeared instead of Goldberg, because Parmelee was not a lawyer and she had paid for a lawyer. Debtor also testified she did not see Goldberg on the day of her § 341(a) meeting, and when she inquired about Goldberg, Parmelee told her Goldberg had the day off.

Goldberg admitted that Parmelee was not an attorney, and that Parmelee attended Debtor's § 341(a) meeting. However, Goldberg indicated that it was common practice to hold several § 341(a) meetings concurrently in different rooms to help expedite the process when things were "backed up." Id. at 155:23. Both Goldberg and Parmelee testified that the trustees were aware of and approved this practice, and, because Goldberg's office

---

[6] The "Tax Affidavit" is a form Goldberg has clients sign when they claim they are not required to file a federal income tax return for a certain year, because their income was insufficient to trigger the filing requirements of I.R.C. § 6012.

-7-

sometimes conducted over one hundred § 341(a) meetings in a day, this practice was necessary. Goldberg stated that on the day of Debtor's § 341(a) meeting, he was with Trustee in an adjacent room, but was available if needed. Goldberg testified that if he sent someone else from his office to a § 341(a) meeting, that person would only serve as a representative taking notes, not as counsel providing legal advice. Goldberg explained that Parmelee acted with Goldberg's express authority, and that Parmelee did not give legal advice.

Parmelee's testimony regarding Debtor's § 341(a) meeting was not so certain. Parmelee believed Goldberg was there, but he did not recall. "[T]o the best of my knowledge, he [Goldberg] could have been in another room doing other - other cases. I don't recall." Hr'g Tr. (Oct. 5, 2009) 25:6-7. In any event, Parmelee was certain no problems arose at Debtor's meeting requiring Goldberg's assistance. When Parmelee was asked if he was authorized by Goldberg to go to § 341(a) meetings in Goldberg's absence, Parmelee responded "No. We would try to find somebody else to cover them." Id. at 26:2.

Although the parties agreed on who attended the § 341(a) meeting, disagreement existed as to what was said and what happened during the meeting and thereafter. According to Debtor's testimony, following an injury she suffered several years before, the IRS had told her she was "purged" and no longer needed to file federal income tax returns. Consequently, she had not filed returns for several years. Because of her understanding, Debtor testified that she was confused when the IRS agent told her at the § 341(a) meeting that she may owe money based on some gambling

-8-

winnings and that she needed to file tax returns. Debtor testified she advised the IRS agent that she was "purged" and did not have to file, and that Parmelee told her not to worry because he would take care of it. Debtor testified that her tax return issue was left unresolved after the § 341(a) meeting. On cross-examination, Goldberg's attorney introduced Debtor's § 341(a) meeting transcript. Reading from the transcript, Debtor had responded "ok" after the IRS agent stated that returns from the priority tax years were required, and that the agent would give Parmelee Debtor's tax transcripts so that Goldberg's office could prepare and file the required returns.

Because of this exchange at the § 341(a) meeting, Goldberg contended Debtor had notice that tax returns for years 2004-2007 would be required, and that Debtor had authorized the preparation of those returns. Goldberg also testified that tax returns were required if clients wanted their plans confirmed.

Following her § 341(a) meeting, Debtor testified that she tried to reach Parmelee in October 2008 regarding the status of her case, but claimed that she was not able to speak with him at that time because Goldberg's office "kept shoving [her] off to Elizabeth [Allen]." Hr'g Tr. (Aug. 24, 2009) 34:4. Consequently, since no one contacted her, Debtor sent Lonnie to Goldberg's office "to find out where we stood about modification, where we stood with the [IRS] . . . ." Id. at 34:13-14.

As for the loan modification, Debtor testified that she eventually discussed the issue with Allen, but she was worried because she was now three months behind on her mortgage. Debtor ultimately decided to contact the lender herself. A company

-9-

representative told Debtor that he could walk her through a modification. On November 4, 2008, Debtor attempted to file the modification documents with the court, but they were rejected because she had an attorney of record. About a week later, on November 10, 2008, Debtor's Plan #4 was confirmed.

Debtor testified that although she knew Plan #4 had been filed, she had not received a copy to review or approve beforehand. Debtor stated that when she eventually did receive a copy of her confirmed Plan #4, she discovered it included "bills on there that were from ten years ago." Id. at 39:17. Moreover, under Plan #4 she was to repay $160,000, even though Debtor believed she owed only $38,000 to $40,000 according to her own paperwork and receipts. Debtor testified that she attempted to advise Goldberg's office that many of the claims listed were not valid, but Parmelee told her "you have the proof of burden. We don't handle that. You got to prove it yourself." Id. at 39:20-21. Given Parmelee's response, Debtor testified that she contacted about three or four creditors. According to Debtor, those creditors advised her they had no knowledge of her because the debts were ten years old, and, they agreed to confirm, in writing, that she did not owe them anything. Debtor further testified that she stopped making payments under Plan #4 in either March or April 2009, because she "didn't want to contribute money to something I didn't understand. I felt it was being handled wrong. Money was going in the wrong places. I was being lied to. I didn't want to be a part of that." Id. at 42:15-18.

Meanwhile, Debtor was still trying to get the loan modification. Although she had completed the required paperwork

herself and had tried, unsuccessfully, to file it, Goldberg refused to file it for her until she paid him an additional $500. According to Debtor, she felt forced to pay the $500. After receiving the additional payment from Debtor, Goldberg filed a Motion to Refinance and the related Loan Modification Agreement documents, together with a notice of hearing for December 18, 2008. This motion, as well as an amended proposed order filed on January 7, 2009, were both denied because the order referred to personal rather than real property, included an altered LR 9021 certification, and was "too sloppily drafted." Debtor testified that she learned of Goldberg's incorrect filing "[b]ecause I got copies of the paperwork that it was rejected. My – the mortgage company, the one that was working with me, told me he couldn't believe it." Id. at 44:6-8.

On January 20, 2009, the bankruptcy court granted the Motion to Refinance, authorizing Debtor to proceed with the terms of the Loan Modification Agreement and vacating the prior order denying approval.

Referring to her multiple problems with Goldberg, Debtor sent Trustee a letter on January 22, 2009, notifying him she wanted to terminate Goldberg as her attorney. Debtor also sent Goldberg a letter notifying him she no longer wanted him to represent her, citing malpractice, unprofessionalism and forgery of federal documents. Debtor also requested a refund of all fees, and stated that she would pursue litigation if Goldberg did not return her money.

**B.    The motion for sanctions**

On January 30, 2009, Debtor, proceeding pro se, moved for

sanctions against Goldberg ("Sanctions Motion"). Debtor asserted that Goldberg, or one of Goldberg's employees, forged her signature on the tax returns filed on her behalf with the IRS for the years 2004, 2005, 2006 and 2007 ("Tax Returns"). Debtor also alleged that Goldberg acted unprofessionally towards her. In particular, Debtor alleged that Goldberg embarrassed her in front of his staff, refused to communicate with her and misled her regarding the cost of her bankruptcy and related services. Further, Debtor asserted that Goldberg lied to her on more than one occasion and committed malpractice.

Goldberg opposed the Sanctions Motion, contending that he prepared, signed and filed the Tax Returns after the IRS agent reported at the § 341(a) meeting that Debtor had gambling winnings and was required to file. Goldberg also stated that Debtor had instructed his staff to sign the returns. Goldberg characterized Debtor's complaints as a result of his inability to "perform an impossible task" of allowing her to discharge her debts and still maintain her lifestyle. In a later affidavit filed by Goldberg on March 11, 2009, he stated that Debtor's signed 2848 POA authorized him to sign Debtor's name on the Tax Returns.

In Debtor's reply, she again denied authorizing Goldberg to prepare, file or sign the Tax Returns. Debtor also stated that she had now discovered the CC Certificate filed with the court, which she did not recognize. Debtor denied ever calling the service or completing the counseling online, and claimed that the CC Certificate was fraudulent.

In a later discovery motion, Debtor requested several items, including copies of all records pertaining to her bankruptcy case.

-12-

In her statement of facts, Debtor argued that none of the Tax Returns identified a 2848 POA, but bore only her name signed by Goldberg.

**C. The evidentiary hearings**

The bankruptcy court conducted four evidentiary hearings related to the Sanctions Motion on March 16, August 24, October 5, and December 15, 2009.

**1. Hearing #1**

The first evidentiary hearing was held on March 16, 2009. The bankruptcy court first addressed Goldberg's motion to withdraw as counsel of record. Finding no objection to the motion, the court granted it. After discussing Debtor's desire to hire new counsel and the difficulties it was presenting, the bankruptcy court proceeded to discuss the Sanctions Motion. The court decided to give both parties additional time for discovery and preparation after Goldberg attempted to introduce documents allegedly signed by Debtor to which Debtor objected, and Debtor attempted to introduce witnesses without giving notice to Goldberg.

Following the first hearing, Debtor filed another discovery motion, requesting the original, signed 2848 POA. According to Goldberg's response, all original documents were scanned and then destroyed for the protection and privacy of the debtor.

**2. Hearing #2**

The second evidentiary hearing was held on August 24, 2009. Because Debtor alleged her signature was forged on several documents, most evidence and testimony related to when, where and how documents were signed. Debtor first denied signing any

-13-

documents, claiming she had only completed a questionnaire when she went to Goldberg's office. Subsequent testimony by Debtor varied, however, as to whether she had signed a couple of documents or no documents.

When asked about the packet she completed, Debtor could not describe it with much detail, testifying only that it was a little package requesting information about creditors. "It was a little packet. It was more of a questionnaire, and I think you sign a couple of pages. I don't remember." Hr'g Tr. (Aug. 24, 2009) 23:23-24.

Regarding the CC Certificate filed with the court, Debtor denied ever completing a credit counseling course, and testified that she did not personally contact, nor did she authorize anyone at Goldberg's office to contact, the Consumer Credit Counseling Service of Greater Atlanta.

As for the Tax Affidavit, Debtor testified the signature on it was not hers, and that she had not authorized Goldberg, or anyone in Goldberg's office, to complete or sign it. Debtor also testified that Parmelee never witnessed her sign the Tax Affidavit as he claimed. Although it bore Pamelee's notary stamp, Debtor testified that she had not signed a notary book, that Parmelee had never notarized her signature, that he never stamped or signed anything in her presence, and that he never asked for her identification.

With respect to the Tax Returns, Debtor testified that she did not know she had to prepare or file any tax returns, and that Goldberg had, without her consent, prepared and filed them, forging her name and marking the returns as "self-prepared."

-14-

Debtor also denied signing the 2848 POA. Debtor stated that she discovered Goldberg had prepared and filed the Tax Returns after the § 341(a) meeting only because she received a notice from the IRS informing her that she owed approximately $800.

Although Debtor declared in her Sanctions Motion that she went to Goldberg's office after learning of the Tax Returns and that Allen had given her copies of the four returns, Debtor testified to a different series of events at the hearing. Debtor now stated that after finding out about the returns, she called Goldberg's office, spoke to Allen, but Allen would not give her copies or any information about them, telling Debtor she would get back to her. Debtor testified that although the Tax Returns prepared and filed by Goldberg showed a liability, she later prepared and resubmitted the returns and actually owed nothing.

Goldberg was questioned extensively on both direct and cross-examination. Goldberg testified that he was admitted to practice law in Pennsylvania, New Jersey, Nevada and before the Federal Tax Bar. Goldberg testified that since opening his practice in Nevada in December 1996, he has prepared thousands of tax returns. Goldberg testified that he held an LLM in taxation and agreed that he had a "superior knowledge of federal tax issues." Id. at 100:4.

When Goldberg was asked if he had received complaints from other clients, he testified that fifteen or twenty complaints had been filed with the state bar since he started his practice. "You can't make every client happy when you have 20,000 clients." Id. at 164:9-10.

Several disputed documents were also discussed — the Tax

-15-

Affidavit, the 2848 POA and the Tax Returns. Goldberg stated that before a plan can be confirmed, a client must produce the past four years of tax returns, or a Tax Affidavit if the client claims they do not have to file returns. Goldberg stated that trustees will not approve a plan without either a debtor's tax returns or the Tax Affidavit. Additionally, Goldberg stated that a Tax Affidavit would be completed at the retainer meeting. Goldberg agreed that Debtor initially believed she did not have to file tax returns, which is why he had her sign the Tax Affidavit. Goldberg testified that he became aware of Debtor's need to file returns at the § 341(a) meeting.

Goldberg testified that he used the tax transcripts the IRS agent gave to Parmelee at the § 341(a) meeting to complete Debtor's Tax Returns. Therefore, he did not need or use Debtor's Tax Affidavit to get her financial information. However, on cross-examination, Goldberg changed his testimony, denying that he used the information shown in the tax transcripts, and denying that he ever stated this was the information he used to prepare Debtor's Tax Returns.

When questioned about the Tax Returns, Goldberg testified that he usually prepares and signs his client's returns with their name. Goldberg estimated he has completed anywhere from 3,000-5,000 tax returns and personally signed his client's signature on 30-50% of them. Goldberg admitted that he does not identify himself as the tax preparer or do anything to indicate that someone other than the client had prepared and signed the tax return. Goldberg testified that he believed he could do so because "I've had no issues with the IRS or anybody ever saying

-16-

anything, and it's been going on for 13 years with the IRS directly. No one's ever said a word, and no clients ever complained . . . ." Id. at 104:7-10. Goldberg opined that his practice complied with federal law, and he did not know of any additional measures required by federal law for legally signing a client's return.

When asked why the Tax Returns he had prepared for Debtor read "self-prepared," Goldberg stated that it did not make sense to pay $2,500 a year for professional taxation software, so he used Quicken, which automatically indicates "self-prepared" on each return because Quicken is meant to be used by individuals preparing their own tax returns. Goldberg testified that although he had tried many times to override this default, he had been unsuccessful. When questioned about how the IRS would know that a tax return marked self-prepared, and with a signature bearing the name of the person identified on the tax return, had actually been prepared and signed by someone else, Goldberg responded:

A.   Only that I would have gave it to them [IRS] at a confirmation hearing which is what we would do in every one of these cases.
     . . . .

Q.   Have you ever told the IRS of this practice?

A.   They know all about it.
     . . . .

Q.   And how is it that you believe that these IRS tax agents know that you are signing your name to other people's tax returns?
     . . . .

A.   I would tell them I signed the returns.
     . . . .

Q.   It's your testimony that each and every time, each of the thousands and thousands of times, you've signed someone else's 1040 form . . . and given it

-17-

to an IRS agent at a confirmation hearing . . . that you said to that IRS agent . . . here is a tax return for my client which I signed for them.

A. No.
. . . .

Q. Okay. Well, how do these agents find out?

A. If they ask, I say I signed them . . . .
. . . .

Q. Well, how often does the IRS agent ask, hey, did they actually sign their own self-prepared tax document?

A. Over the years, they may have asked me. I don't know. I mean, I've signed them. They know I've signed them. I've never lied about signing them.
. . . .

Q. So other than they should know, you can't offer us any other way that any of these IRS agents should know that it's your signature, not the person whose 1040 it was?

A. No.

Id. at 110:19-20; 126:12-13; 126:24-127:1, 127:12; 128:12-24; 128:25-129:1; 129:3-7; 130:4-7.

Goldberg testified that a signed 2848 POA provided the requisite authority for him to sign a tax return for a client, or the client could give him permission to sign. Goldberg revealed, however, that he never requested nor received such permission in writing. Contrary to Goldberg's claim in his opposition to the Sanctions Motion that the 2848 POA allegedly signed by Debtor authorized him to sign Debtor's name on her tax returns, Goldberg now testified the 2848 POA was not the basis of his authority to sign, but, rather, it was only used to obtain information about a client from the IRS.

After reviewing the 2848 POA instructions on the stand, Goldberg agreed that it allows a person to designate a signing

-18-

representative under only a very narrow set of circumstances, and, then, only if specifically stated on the form. Goldberg testified that he had no personal knowledge of whether Debtor fell within the circumstances listed that would have allowed her to authorize him to sign her Tax Returns, nor had he requested permission from the IRS to sign them based on "other good cause." In any event, Goldberg maintained that a client's oral authorization gives him legal authority to sign the returns. "If I'm using my [2848 POA] as authority to sign the returns, I'm not using that authority. I'm using the client telling me to sign their returns . . . ." Id. at 142:15-17. Goldberg testified repeatedly that Debtor had requested he sign the returns and had given permission for him to sign the returns.

Goldberg was also unable to specify when someone in his office had last updated the 2848 POA used by his office. Goldberg admitted that he did not pay attention to the revision date on the forms, and that he had not heard of any update or revision to the 2848 POA. He admitted that the 2848 POA allegedly signed by Debtor was the December 1997 version, but other evidence showed that the form had undergone revision many times between 1997 and 2008, the time of Debtor's bankruptcy. Goldberg testified "[w]hether it was revised or not, it still works." Id. at 124:5. Goldberg speculated that changes in the form only enhanced his powers as a tax preparer and licensed agent with the IRS.

When asked why he had not produced the original document during discovery, Goldberg testified that he did not have the original copy of Debtor's 2848 POA because it had been scanned and shredded. Nonetheless, Goldberg admitted that he had not

-19-

personally shredded the document, nor had anyone in his office confirmed that the document had actually been shredded.

Unlike the 2848 POA, however, Goldberg testified that most client documents were not shredded. Usually a client's file held fifteen to twenty-five other wet-signed original documents. Goldberg described these files as "cover-your-butt" files, containing such documents as the retainer agreement, the tax affidavit, the bankruptcy questionnaire, the B-22, the notice of filing, assignment of interest, and other documents necessary to protect Goldberg in case the "clients don't give you all the information or mislead you or forget things . . . ." Id. at 133:15-16.

When asked why the 2848 POA was shredded when other sensitive documents were not, Goldberg explained that his office had experienced break-ins, so destroying the original 2848 POAs prevented thieves from accessing a client's private tax information. Goldberg testified that unlike other documents that might contain a client's social security number, "a [2848 POA] is a different story, signatures, CAF numbers." Id. at 132:8-9.

After hearing extensive witness testimony and statements from counsel wishing to introduce more testimony, the bankruptcy court decided to continue the matter to October 5, 2009.

**3. Hearing #3**

The third evidentiary hearing on the Sanctions Motion was held on October 5, 2009. Goldberg and three of Goldberg's employees testified: Parmelee, Allen, and Jennifer Rigdon ("Rigdon"), an associate attorney in Goldberg's office. Ilene and Lawrence Pondel ("Pondels"), former clients of Goldberg's, also

-20-

testified. Narrah Newark ("Newark"), a local bankruptcy attorney of seven years, testified as to her opinion of Goldberg's handling of Debtor's case. Antonia Klekoda-Baker ("Klekoda-Baker"), a document examiner and expert witness for Goldberg, testified as to the authenticity of Debtor's signature on various documents.

Parmelee testified that he met with clients and gave advice, but not legal advice. Parmelee stated that he is the only notary in Goldberg's office, having notarized approximately 1,000 signatures, but admitted that he did not keep a notary book. Although Parmelee knew that state law required him to keep a notary book, he felt he was exempt because he only notarized for Goldberg's clients.

In response to the disputed documents, Parmelee thought Debtor had completed her credit counseling at Goldberg's office because staff completed it for each client while he or she was present. Although Parmelee stated that office staff always completed the counseling requirement in the same way, he admitted Goldberg's office did not have a written procedure. Parmelee also testified that he witnessed Debtor sign the Tax Affidavit, and that it was his signature and notary stamp on the document. Yet, Parmelee later stated that "[t]o the best of my knowledge," Debtor signed and he notarized the Tax Affidavit. Hr'g Tr. (Oct. 5, 2009) 27:22. Parmelee also testified that he did not maintain the originals of documents he notarized; they were either shredded or given to whomever needed them.

As for the credit counseling, Goldberg testified that while a client could do it at home, 99% of his clients completed the credit counseling at his office. Goldberg stated, "It's not a

-21-

class. It's not a credit counseling. It is just in – inputting information of a financial and personal matter . . . .; it usually take [sic] about eight to ten minutes . . . ." Id. at 195:10-11, 195:25-196:1. Because his staff knew how to do it very quickly, Goldberg testified that to save time a staff member would input the information, stating that the client might not even realize they are taking a credit counseling course. Goldberg also testified it was his understanding that Allen did the credit counseling with Debtor. Although Goldberg had testified that clients would have to participate in the credit counseling because of the significant personal information required, he later, in his post-hearing brief, asserted that his office obtained sufficient personal information to complete the credit counseling without Debtor's presence based on her completed questionnaire included in the packet during the May 2008 visit.

Mrs. Pondel testified that she thought Parmelee was an attorney, and that her reference to him as her attorney was never corrected. Mrs. Pondel also testified that Parmelee gave her legal advice, and that she met with Goldberg only once, even though she repeatedly asked to see him. On cross-examination, Mrs. Pondel admitted Parmelee never gave her a business card identifying himself as an attorney. She further admitted that her bankruptcy was dismissed for failure to make payments, and that she did not file a complaint against Goldberg until after she spoke with Debtor, whom she had met outside the courthouse.

Mr. Pondel testified that he met with Goldberg three times and met with Parmelee fifteen to twenty times. He testified that Parmelee had never directed any questions to Goldberg, that

-22-

Parmelee had given him legal advice, and that his belief Parmelee was an attorney had also never been corrected. Mr. Pondel also testified that he did not attend a credit counseling course online or otherwise, and when he later asked Parmelee about his certificate, Parmelee did not give a specific answer, just telling the Pondels they needed it. On cross-examination, Mr. Pondel admitted he had never received any business card, letterhead, receipt, or legal document indicating Parmelee was an attorney.

Rigdon, Goldberg's associate, testified that she had met with the Pondels a couple of times and had represented them at their § 341(a) meeting. She had never heard the Pondels express dissatisfaction with Goldberg. Rigdon also testified that Parmelee did not expressly or impliedly hold himself out as an attorney, nor did Mr. Pondel ever refer to Parmelee as an attorney. On cross-examination, Rigdon admitted she did not know the number of times the Pondels had met with Parmelee without her being present.

Newark testified that from the documents she had reviewed, nothing appeared out of the ordinary, and Goldberg appeared to be following standard procedure for a bankruptcy attorney. On cross-examination, Newark stated that although her clients complete their credit counseling online in her office, it was done without assistance from her staff. She also testified that her office did not engage in any tax work.

Klekoda-Baker, Goldberg's expert witness, testified that she believed Debtor's signature on the copy of the 2848 POA was authentic because it matched the "known" signature that appeared on Debtor's Grant Bargain and Sale Deed she had obtained from the

-23-

Clark County Assessor's website. However, on cross-examination, Klekoda-Baker testified that although she examined originals with wet signatures for almost every document, she had no original 2848 POA to examine. On re-direct, Klekoda-Baker testified that she found no signs of forgery or cut-and-paste on any of the documents she examined. Klekoda-Baker additionally testified that the signature on the 2007 Tax Return was not Debtor's. As to the Tax Affidavit, Klekoda-Baker testified that she did not have any known signatures to substantiate conclusively whether it was Debtor's signature.

### 4. Hearing #4

The final evidentiary hearing on the Sanctions Motion was held on December 15, 2009. William Leaver ("Leaver"), Debtor's expert document examiner, testified that the signature on the 2848 POA was most likely manipulated either by computer or cut-and-paste, as several line-quality faults existed that indicated either simulation or tracing, as well as a gap in the signature line. Furthermore, Leaver testified that Debtor's signature on the Tax Affidavit may not have been authentic because of a variance between that signature and all of the known signatures Leaver examined.

After hearing testimony, the bankruptcy court took the matter under advisement, requesting post-hearing briefing from the parties.

### D. Memorandum Decision and Order on Sanctions Motions

The bankruptcy court entered its Memorandum Decision on the Sanctions Motion ("Sanctions Decision") and related order ("Sanctions Order") on December 4, 2012. The court found that

-24-

none of Goldberg's witnesses could establish that Debtor completed the credit counseling in Goldberg's office. Further, although Goldberg and his staff asserted that a client's credit counseling could not be completed by his staff without the client's input, the court found that other evidence showed that his staff had sufficient client information to complete it and obtain the certificate without the client's involvement. Consequently, the court concluded that Goldberg or his staff impersonated Debtor, improperly obtained her CC Certificate, and filed it in bad faith. The court found that such conduct violated Rule 9011, several ethical rules, and possibly criminal statutes.

The court rejected Goldberg's assertion that Rule 9011(b) was not implicated by his conduct since he was given no "safe harbor." The court noted that Rule 9011(c)(1)(A) provides an exception to the 21-day safe-harbor rule if "the conduct alleged is the filing of a petition." The court determined that Goldberg was not entitled to the safe-harbor rule because he knew at the time of filing Debtor's petition that relief under chapter 13 would be impossible because Debtor had not personally completed credit counseling as required by § 109(h). The court also found that Goldberg filed Debtor's petition as-is in order to cut corners, to avoid delay, to begin collecting his fee, and to move on to the next paying client.

In addition to violating Rule 9011, the court found Goldberg's conduct violated several provisions of the Nevada Rules of Professional Conduct ("NRPC"). Goldberg had violated NRPC 3.3 when he filed the CC Certificate that he, or someone in his office, obtained by impersonating Debtor and by using her personal

-25-

information. The court noted that although Debtor had informed Goldberg that she had not personally completed credit counseling, Goldberg failed to withdraw the CC Certificate. Goldberg's conduct had also violated NRPC 8.4, as well as several criminal statutes.[7] In particular, by impersonating Debtor to obtain the CC Certificate, and then filing and refusing to withdraw the fraudulent document with the court, Goldberg had likely violated, and continued to violate, 18 U.S.C. §§ 157, 1519 and 1028. Consequently, the court referred the matter to the United States Attorney for the District of Nevada.

Regarding the Tax Returns, the court found that Goldberg had signed them without authority to do so. The court concluded this after finding (1) Debtor's testimony more credible than that of Goldberg and Allen, (2) the original 2848 POA was never produced, and (3) substantial questions existed as to whether the signature on the scanned copy of the 2848 POA was actually Debtor's. Accordingly, the court determined that Goldberg's unauthorized signature on the Tax Returns and false representation to the IRS

---

[7] NRPC 3.3 provides that "[a] lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

NRPC 8.4 provides, in relevant part: "It is professional misconduct for a lawyer to: (a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; (b) Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; (c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) Engage in conduct that is prejudicial to the administration of justice[.]"

-26-

that the Tax Returns were self-prepared violated NRPC 3.3, 4.1[8] and 8.4 and subjected Goldberg to possible discipline. Because Goldberg's conduct may have also violated 26 U.S.C. §§ 7206 and 7207, the court referred Goldberg to the United States Attorney for the District of Nevada.

The court also found that Goldberg, or someone in his office, signed Debtor's Tax Affidavit rather than Debtor. Neither expert witness could confirm the authenticity of the signature. Further, testimony of Goldberg's witnesses, Parmelee and Allen, conflicted. Third, Debtor's purported signature on the document could not be corroborated by a properly logged entry in a notary book. As a result, the court concluded that Goldberg's conduct had violated NRPC 4.1, 8.4 and 5.3 and was subject to discipline.

Based on the above, the bankruptcy court imposed the following sanctions: Goldberg was suspended for a period of six months from filing any new bankruptcy cases in the district; Goldberg had to provide a copy of the court's decision to every prospective chapter 13 client for five years; Goldberg had to return to Debtor all funds paid in connection with her case; and Debtor was entitled to payment by Goldberg of all reasonable attorney's fees and costs incurred prosecuting the Sanctions Motion. Considering Goldberg's conduct and practices in connection with this case, the court also referred Goldberg for investigation to the United States Attorney for the District of

---

[8] NRPC 4.1 provides: "In the course of representing a client a lawyer shall not knowingly: (a) Make a false statement of material fact or law to a third person; or (b) Fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6."

Nevada, the Nevada Secretary of State, the Nevada Attorney General, the Clark County District Attorney, the State Bar of Nevada, and the Office of the United States Trustee.

Goldberg timely appealed the Sanctions Order.

After Debtor's attorneys submitted briefs and time records for their fees, to which Goldberg objected, the bankruptcy court entered an order awarding Debtor approximately $45,000 in attorney's fees and costs ("Fee Order") on January 24, 2013. Goldberg timely appealed the Fee Order.

The appeals were consolidated on February 20, 2013.

**II. JURISDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

**III. ISSUES**

1. Did the bankruptcy court abuse its discretion when it entered the Sanctions Order?

2. Did the bankruptcy court abuse its discretion when it entered the Fee Order?

**IV. STANDARDS OF REVIEW**

We review all aspects of an award of sanctions for an abuse of discretion. Price v. Lehtinen (In re Lehtinen), 332 B.R. 404, 411 (9th Cir. BAP 2005), aff'd, 564 F.3d 1052 (9th Cir. 2009); In re Nguyen, 447 B.R. 268, 276 (9th Cir. BAP 2011)(en banc). A bankruptcy court abuses its discretion if it applied the wrong legal standard or its findings were illogical, implausible or without support in the record. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

The appellate court must give great deference to the trial

-28-

court's findings of fact under this standard. A reviewing court is not entitled to reverse a finding, even though convinced that had it been sitting as the trier of fact it would have weighed the evidence differently. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985). Even greater deference must be afforded to the trial court's factual findings where credibility determinations are at issue, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Id. See also Rule 8013.

## V. DISCUSSION

**A. The bankruptcy court did not abuse its discretion when it entered the Sanctions Order.**

**1. The bankruptcy court had proper jurisdiction over the case and Goldberg despite the faulty CC Certificate.**

Goldberg contends that, because the bankruptcy court had determined Debtor had not taken the credit counseling course, thereby requiring the dismissal of her case, the court lacked jurisdiction to impose sanctions. Goldberg asserts that § 109(h)[9] is jurisdictional, and a debtor's non-compliance with the statute strips the bankruptcy court of jurisdiction. We disagree.

Compliance with the credit counseling requirements of § 109(h) is a matter of eligibility rather than jurisdiction. Mendez v. Salven (In re Mendez), 367 B.R. 109, 117-18 (9th Cir.

---

[9] Section 109(h) provides that "an individual may not be a debtor . . . unless such individual has, during the 180-day period ending on the date of filing of the petition by such individual, received from an approved nonprofit budget and credit counseling agency . . . an individual or group briefing (including a briefing conducted by telephone or on the Internet) that outlined the opportunities for available credit counseling and assisted such individual in performing a related budget analysis."

-29-

BAP 2007)(compliance with § 109(h) is an eligibility requirement, not a jurisdictional requirement).[10]  In <u>Mendez</u>, we held that a bankruptcy court has jurisdiction over a case commenced by a debtor who has not complied with the strict requirement of § 109(h).  <u>Id</u>. at 118.  <u>See also</u> <u>In re Parker</u>, 351 B.R. 790, 796 (Bankr. N.D. Ga. 2006)(once a petition is filed, the bankruptcy court has authority to determine debtor's eligibility and retains jurisdiction even over cases commenced by an ineligible debtor).  Accordingly, the bankruptcy court did not lack jurisdiction over Debtor or Goldberg, who filed Debtor's petition and related documents and subjected himself to the court's jurisdiction and authority.

Similarly, Goldberg contends the bankruptcy court should have struck Debtor's case for lack of jurisdiction based on the same rationale of her non-compliance with § 109(h).  In other words, Goldberg asserts that because consumer credit counseling is a prerequisite to eligibility, Debtor's failure to comply with the requirement rendered her case "void ab initio," as if it never had been commenced.  As we noted above, § 109(h) is not jurisdictional and the filing of a petition, even by an ineligible debtor, nevertheless commences a bankruptcy case and provides the court with jurisdiction.  In addition, for Goldberg to assert that Debtor failed to comply with § 109(h), not only must he admit the fraudulent nature of the CC Certificate filed on Debtor's behalf, Goldberg must also admit he filed false papers with the court, in

---

[10] Sections 109(h)(2) and 109(h)(3) provide debtors with some exceptions from the counseling requirement upon approval from the court.  However, none of the exceptions are applicable to this case.

-30-

willful violation of a variety of court rules and rules of professional conduct. Goldberg would thus admit to violations against the bankruptcy court, while asserting that the bankruptcy court had no duty or authority to regulate such conduct. We reject such a notion.

Goldberg next argues confirmation of Debtor's Plan #4 made the credit counseling issue moot. Here, Goldberg appears to argue that his conduct with respect to Debtor's CC Certificate could not provide the basis for sanctions against him, assuming the issue became moot upon confirmation. We too reject this argument. The status of Debtor's plan cannot provide an excuse or shield for Goldberg's conduct and ethical violations.

Goldberg also contends that Debtor waived and ratified any failure to take the credit counseling class. His argument is misguided. Goldberg's conduct with respect to the CC Certificate is not the only basis upon which the bankruptcy court imposed sanctions. Even if it were, we note Goldberg's ironically polar opposite positions as they relate to § 109(h) compliance, arguing on one hand that it is mandatory and jurisdictional, while also arguing judicial discretion to waive the credit counseling requirement is appropriate in certain circumstances.

Goldberg next argues that the bankruptcy court erred in even deciding the credit counseling issue because it was not part of Debtor's Sanctions Motion. We disagree. According to Debtor, who was appearing pro se, she was not aware of the CC Certificate at the time she filed her Sanctions Motion, and, thus, could not have raised the issue. When Debtor became aware of the document, she promptly brought it to both the court's and Goldberg's attention

-31-

in her response to Goldberg's opposition to the Sanctions Motion. Thus, Goldberg had sufficient notice and time to prepare a defense, which he did. During the four evidentiary hearings conducted over the course of six months, each party called, or had the opportunity to call, witnesses to testify about the CC Certificate. Additionally, both parties offered post-hearing briefing wherein Goldberg was provided an opportunity to respond to Debtor's allegations. Goldberg was therefore given sufficient notice, and the inclusion of the issue of the CC Certificate was appropriate and not unfairly prejudicial.[11] Further, as we noted above, Goldberg's conduct surrounding the CC Certificate is not the only basis upon which the bankruptcy court issued sanctions.

Finally, Goldberg argues that Debtor's voluntary actions judicially and equitably estopped her from seeking sanctions against him. We fail to see where Goldberg raised this argument before the bankruptcy court. By failing to demonstrate that he properly presented this argument to the bankruptcy court, he has waived the argument, and we need not address the merits here. See Ellsworth v. Lifescape Med. Assocs., P.C. (In re Ellsworth), 455 B.R. 904, 919 (9th Cir. BAP 2011)(citing Golden v. Chi. Title Ins. Co. (In re Choo), 273 B.R. 608, 613 (9th Cir. BAP 2002); Branam v. Crowder (In re Branam), 226 B.R. 45, 55 (9th Cir. BAP 1998), aff'd, 205 F.3d 1350 (9th Cir. 1999)(unpublished table

_____

[11] Goldberg also argues that even if the bankruptcy court had jurisdiction, it erred in entering a final judgment, because bankruptcy judges are prohibited from entering a final judgment in core proceedings, citing Stern v. Marshall, 131 S.Ct. 2594 (2011). Stern is not applicable to this case because the issues on appeal do not involve a state law matter unrelated to the bankruptcy case asserted as a compulsory counterclaim.

-32-

decision)).  In any event, we reject any inference by Goldberg that Debtor's actions precluded the bankruptcy court from taking disciplinary action against him.

>    **2.  The bankruptcy court was authorized to sanction Goldberg.**

>>    **a.  The bankruptcy court did not err when determining its authority to sanction Goldberg.**

>>>    **i.  Rule 9011**

Goldberg argues the bankruptcy court erred in determining that he had violated Rule 9011, because the rule does not apply to a client against her own attorney.  To the contrary, Rule 9011 is appropriately used to protect other parties, as well as debtors, from the misconduct of a debtor's attorney.  <u>Cohn v. U.S. Trustee (In re Ostas)</u>, 158 B.R. 312, 319-20 (N.D.N.Y. 1993)(rejecting the argument of debtors' counsel that Rule 9011 was only intended to protect opposing parties, not the attorney's own clients).

Generally, Rule 9011 is directed at papers signed by litigants and/or attorneys and filed with the court. Rule 9011(b)(3) provides that "by presenting to the court . . . a paper . . . an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after a reasonable inquiry . . . the allegations or factual contentions have evidentiary support."  Rule 9011(b) "provides for the imposition of sanctions when a filing is frivolous, legally unreasonable, or without factual foundation, or is brought for an improper purpose."  <u>Simpson v. Lear Astronics Corp.</u>, 77 F.3d 1170, 1177 (9th Cir. 1996)(citing <u>Warren v. Guelker</u>, 29 F.3d 1386, 1388 (9th Cir. 1994)).  The Rule 9011 "safe harbor" exception does not apply when, as in this case, the violation involves the petition,

-33-

since the filing of the petition has immediate serious consequences to creditors, including the imposition of the automatic stay.

The bankruptcy court found Goldberg violated Rule 9011 and was subject to sanctions for filing the fraudulent CC Certificate. Specifically, the court found that either Goldberg, or one of his staff, impersonated Debtor and improperly obtained her CC Certificate. Despite knowing that Debtor had not obtained it as required under § 109(h), Goldberg nevertheless filed the document. Accordingly, such filing had been done in bad faith.

We conclude that it was not an abuse of discretion for the bankruptcy court to determine that Goldberg's actions were frivolous, satisfying one of the alternate elements necessary under Rule 9011 for the imposition of sanctions. The word "frivolous," when used in connection with sanctions, denotes a filing that is both baseless — lacks factual foundation — and made without a reasonable and competent inquiry. Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1362 (9th Cir. 1990). An attorney has a duty to conduct a reasonable factual investigation as well as to perform adequate legal research that confirms his position is warranted by existing law (or by a good faith argument for a modification or extension of existing law). Christian v. Mattel, Inc., 286 F.3d 1118, 1127 (9th Cir. 2002). "An attorney's signature on a complaint is tantamount to a warranty that the complaint is well grounded in fact and 'existing law' (or proposes a good faith extension of the existing law) . . . . " Id. Thus, a finding that no reasonable inquiry was made into either the facts or the law is tantamount to a finding of frivolousness.

-34-

_Townsend_, 929 F.2d at 1362.

Goldberg's filing of the CC Certificate was frivolous because he failed to show that he made any reasonable inquiry into either the facts or the law. Even when Debtor notified him about the questionable CC Certificate, nothing in the record suggests that Goldberg made any attempt to inquire about, or address, the issue. He did not contact Debtor, he did not conduct an audit of his records and he did not inquire with his staff or implement any changes to his office procedures. Additionally, Goldberg did not attempt to withdraw the CC Certificate or have Debtor complete the counseling and obtain a new certificate. Under no circumstances would Goldberg's lack of inquiry and action be deemed reasonable.

The Ninth Circuit has held that an attorney's inquiry as to facts contained in signed documents submitted to a court must be measured "objectively against a reasonableness standard, which consists of a competent attorney admitted to practice before the involved court." _Valley Nat'l Bank of Ariz. v. Needler (In re Grantham Bros.)_, 922 F.2d 1438, 1441 (9th Cir. 1991). Goldberg's filing of the CC Certificate was frivolous because his inquiry as to facts contained in it and submitted to the court was not reasonable as objectively compared to a competent attorney admitted to practice before the same court. Although Goldberg argued that Debtor either signed the disputed document or, in the alternative, knew about and ratified his conduct, Goldberg provided no evidence to support his assertions. His witnesses gave conflicting, evasive and continually changing testimony. Goldberg also failed to show a reasonable inquiry as to the authenticity of the documents he filed or that his conduct was

-35-

reasonable when compared to other bankruptcy attorneys. Although Goldberg called Newark, another bankruptcy lawyer, as a witness, she did not opine on the reasonableness of Goldberg's conduct. Rather, she testified that her office protocol and procedures were different than Goldberg's regarding credit counseling and tax returns. Newark stated that although debtors complete their credit counseling requirement at her office, debtors complete it alone, without assistance from her staff.

The bankruptcy court's determination that Goldberg violated Rule 9011, and that it had authority under Rule 9011 to impose sanctions, was not erroneous. Nonetheless, even if the court could not sanction Goldberg under Rule 9011, it had ample other authority upon which it could rely to impose sanctions.

### ii. Inherent authority and § 105

Bankruptcy courts have broad authority to run their courtrooms and to supervise the attorneys appearing before them. See Smyth v. Oakland (In re Brooks-Hamilton), 400 B.R. 238, 246 (9th Cir. BAP 2009)(citing Chambers v. NASCO, Inc., 501 U.S. 32, 43, 47 (1991)). Section 105(a) empowers bankruptcy courts to take any action or make any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process. Section 105(a) also authorizes a bankruptcy court to impose penalties, including suspension of an attorney. In re Brooks-Hamilton, 400 B.R. at 248. In Peugeot v. U.S. Trustee (In re Crayton), 192 B.R. 970, 976 n.6 (9th Cir. BAP 1996), the Panel states that § 105(a) "arguably empowers a bankruptcy court to discipline attorneys who appear before it, given that incompetent attorneys frustrate the [Bankruptcy Code's]

-36-

purpose of prompt administration of the estate and equitable distribution of assets."

To satisfy due process, a bankruptcy court must determine that the party to be sanctioned was provided sufficient notice of the potential sanctions before imposing sanctions under § 105(a). Miller v. Cardinale (In re Deville), 280 B.R. 483, 496-97 (9th Cir. BAP 2004). "Generally, the notice regarding sanctions must specify the authority for the sanction, as well as the sanctionable conduct." Id. at 496. Although Debtor's Sanctions Motion did not specifically mention § 105(a), it satisfied the due process standard under § 105(a) because it informed Goldberg that sanctions were pursued for actions indicating that he acted in "bad faith, vexatiously, wantonly, for oppressive reasons, or for other improper purposes." Schwartz-Tallard v. Am. Serv. Co. (In re Schwartz-Tallard), 473 B.R. 340, 351 (9th Cir. BAP 2012).

Alternatively, the bankruptcy court could have imposed sanctions under its inherent authority. "A bankruptcy court's inherent power allows it to sanction 'bad faith' or 'willful misconduct,' even in the absence of express statutory authority to do so." Price v. Lehtinen (In re Lehtinen), 564 F.3d 1052, 1058 (9th Cir. 2009). This inherent authority extends even to allow a bankruptcy court to suspend or disbar an attorney. Id. at 1059. Here, however, statutory authority existed under § 105(a) as well as the Local Rules for the District of Nevada. The NRPC applies to all attorneys admitted to practice before a court within the district. Local Rule IA 10-7. Local Rule IA 4-1 provides that "[t]he court may, after notice and opportunity to be heard, impose any and all sanctions on an attorney . . . . who, without just

-37-

cause: . . . (C) Fails to comply with these rules." Clearly, the bankruptcy court had authority under the Local Rules to sanction Goldberg for his conduct which violated the NRPC.

Given Goldberg's conduct in this case, we conclude that the bankruptcy court had authority under any of the above sources to issue its Sanctions Order against him.

> **b.    The bankruptcy court did not err when determining the types of sanctions it imposed**.

Goldberg argues the six-months suspension was too severe of a sanction. Goldberg also argues the bankruptcy court abused its discretion by ordering him to give prospective clients its opinion for five years into the future. We conclude that the sanctions imposed by the bankruptcy court were fair, supported by the evidence and reasonable. See In re Nguyen, 447 B.R. at 276.

Rule 9011(c)(2) provides that a "sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated," and that such sanctions may include "some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." Dressler v. Seeley Co. (In re Silberkraus), 336 F.3d 864, 871 (9th Cir. BAP 2003).

The American Bar Association Standards include a non-exhaustive list of potential disciplinary sanctions along with a list of relevant factors to be used when determining the reasonableness of such sanctions. In In re Crayton, we adopted the ABA Standards, determining that they "promote[d] the thorough, rational consideration of relevant factors, and help[ed] to achieve consistency when imposing attorney discipline." 192 B.R.

-38-

at 980. We modified our position in In re Nguyen, noting that requiring explicit consideration of each ABA Standard in determining the reasonableness of sanctions was too restrictive. 447 B.R. at 277. While a lack of findings by the bankruptcy court as to each of the factors is not reversible error, in reviewing attorney disciplinary sanctions on appeal, we must determine whether (1) the proceeding was fair, (2) the evidence supports the findings, and (3) the penalty imposed was reasonable.

### i. Fairness of the disciplinary proceeding

Goldberg had sufficient notice and time to prepare a defense. As discussed above, both parties were given ample time to prepare, present testimony and introduce evidence. In addition, each party provided post-hearing briefing wherein Goldberg was provided an opportunity to respond to Debtor's allegations. Accordingly, we conclude the disciplinary proceeding was fair.

### ii. Evidentiary Support

The bankruptcy court articulated extensive evidentiary findings justifying its Sanctions Order. As for the Tax Returns, Goldberg readily admitted to a variety of ethical and rule violations. Goldberg admitted signing his clients' names to filed tax returns. Although he believed his practices complied with federal law, he was unable to cite any specific authority allowing him to sign. Rather, Goldberg rationalized his conduct on the basis that he had done it so often and had received no complaints from either clients or the IRS. Contrary to Goldberg's assertions, the instructions for the 2848 POA clearly show that his practices violate federal law. Consequently, the bankruptcy court determined Goldberg's unauthorized signature on the Tax

-39-

Returns and false representations to the IRS that the Tax Returns were self-prepared violated Rule 9011 and NRPC §§ 3.3 and 8.4 and subjected him to possible discipline. The record supports this determination.

With respect to the 2848 POA, the bankruptcy court found Debtor's testimony to be more credible than that of Goldberg and Allen. Further, the record showed that Goldberg had failed to produce the original 2848 POA, and the authenticity of Debtor's signature on the scanned copy was in question.

Regarding the CC Certificate, the court found that no witness could establish Debtor had completed the credit counseling in Goldberg's office. The court noted the inconsistent witness testimonies, Goldberg's admission that his staff routinely and quickly completed the counseling with Debtors, and Goldberg's admission that information Debtor provided in her initial packet gave him sufficient information to complete her credit counseling without her present. As such, the record supports the bankruptcy court's finding that Goldberg, or his staff, impersonated Debtor, improperly obtained Debtor's CC Certificate and then filed it with the court in bad faith. The record also supports the bankruptcy court's finding that Goldberg, or someone in his office, signed the Tax Affidavit rather than Debtor.

### iii. Reasonableness

The bankruptcy court has broad authority when issuing and determining sanctions. Within the express limitations of Rule 9011(c), the bankruptcy court has considerable discretion in determining the amount of the award. Miller v. Cardinale (In re DeVille), 361 F.3d 539, 553 (9th Cir. 2004). See also

-40-

_Orton v. Hoffman (In re Kayne)_, 453 B.R. 372, 386 (9th Cir. BAP 2011)(a bankruptcy court has wide discretion in determining the amount of a sanctions award). Although Rule 9011(c) states that sanctions should be limited to what is sufficient to deter repetition of such conduct, it also states that payment of some or all of the reasonable attorneys' fees and expenses incurred as a direct result of the violation may be appropriate. Rule 9011(c)(2). An appropriate deterrence penalty may be greater than the amount of compensatory damages. _Fjeldsted v. Lien (In re Fjeldsted)_, 293 B.R. 12, 28 (9th Cir. BAP 2003).

The Local Rules also grant considerable leeway in fashioning sanctions for violations of the NRPC. Local Rule IA 10-7(a) provides that "[a]ny attorney who violates these standards of conduct may be disbarred, suspended from practice before this court for a definite time, reprimanded or subjected to such other discipline as the court deems proper."

Additionally, the court may consider aggravating and mitigating circumstances in deciding the type and severity of the sanction imposed. Aggravating factors justifying an increase in the degree of discipline imposed include: (1) dishonest or selfish motive; (2) a pattern of misconduct; (3) multiple offenses; (4) refusal to acknowledge wrongful nature of conduct; and (5) substantial experience in the practice of law. _In re Nguyen_, 447 B.R. at 277. See also _In re Seare_, 2013 WL 2321664, at *54 (Bankr. D. Nev. 2013).

The bankruptcy court was mindful this was not the first time Goldberg had violated, or had been sanctioned for violating, various rules, which included the same conduct of forging

-41-

signatures on credit counseling certificates and filing them with the bankruptcy court. Goldberg was previously sanctioned in the same judicial district by Bankruptcy Judge Bruce A. Markell in In re Sanford, 403 B.R. 831 (Bankr. D. Nev. 2009), and In re Pagaduan, 429 B.R. 752, 760 (Bankr. D. Nev. 2010), aff'd in part, vacated in part, 447 B.R. 614 (D. Nev. 2011). In Pagaduan, Judge Markell found that Goldberg, or someone in his office, generated a credit counseling certificate by impersonating the debtors. Id. at 760. The debtors had proof of being out of the country on the day they allegedly completed the counseling. Id. at 758. Goldberg unsuccessfully asserted, as he did in this case, the debtors completed the counseling requirement without even realizing it.

Although Goldberg has been reported and sanctioned for previous violations, his unprofessional and, in some instances, possibly criminal conduct apparently continued. Disciplinary sanctions should, of course, be progressive. Notwithstanding prior sanctions, Goldberg appeared to continue to engage in a willful pattern of careless and unprofessional conduct. The bankruptcy court found Goldberg refuses to accept responsibility for his actions and that prior sanctions have not resulted in deterring Goldberg's disregard for judicial rules and procedures. Additionally, the court noted that Goldberg admitted to having received fifteen to twenty prior bar complaints during the years he had practiced in Nevada. Goldberg further testified that he had been sued by a couple of clients since 1996 and had two or three fee disputes. Consequently, and with "reluctan[ce]," the bankruptcy court imposed the sanctions it did against Goldberg "in

-42-

an effort to deter future similar violations[.]" Mem. (Dec. 4, 2012) 40:25-41:1.

We conclude that the sanctions imposed in this case were reasonable and consistent with the progressive nature of discipline that was required in this case.[12]

### c. The bankruptcy court did not clearly err in its finding of facts.

Goldberg argues that the bankruptcy court erred in finding that Debtor did not sign her Tax Affidavit and did not permit Goldberg to sign her Tax Returns. Goldberg similarly argues the bankruptcy court erred in believing Debtor's version of events. We reject Goldberg's assertion.

The bankruptcy court expended considerable time with this case. It conducted four evidentiary hearings resulting in eleven witnesses testifying and forty-four exhibits admitted into evidence. It also accepted and reviewed further briefing by both parties prior to taking the matter under submission.

In its Sanctions Decision, the bankruptcy court thoughtfully and thoroughly laid out the basis of its reasoning. Overall, the court found Debtor's and Lonnie's testimony to be generally

---

[12] Goldberg also argues that the bankruptcy court's three-year delay in deciding these issues and use of outside sources has prejudiced him. The only support Goldberg asserts here is that if he were a menace to society, the court would have ruled earlier. We conclude that the delay was not prejudicial, but merely gave Goldberg additional time before having to pay the Fee Order, and it allowed him to continue to conduct his profitable business.

Goldberg additionally argues that Parmelee's not keeping a Notary log book was not part of Debtor's original motion, so therefore he should not be sanctioned for Parmelee's acts or omissions. Contrary to Goldberg's assertion, the Sanctions Decision stated the lack of a notary log was "not a separate basis for the Sanctions Motion."

-43-

consistent and credible, while it found Goldberg and his staff's explanations and rationalizations to be conclusory, contradictory, frequently evolving throughout the hearing and without evidentiary support.

As for the 2848 POA, the court found that Goldberg's reason for destroying it, the one document that expressly authorized him to obtain tax information or to possibly file tax returns, while keeping originals of other private documents in his "cover-your-butt" folder "bizarre at best." Id. at 18 n.13. The court also noted Goldberg's inconsistent references to the 2848 POA. Initially, Goldberg asserted the 2848 POA was the basis of his authority to sign the returns. Later, however, Goldberg indicated that destruction of the original 2848 POA did not matter, because the basis of his authority to sign returns was a client's oral authorization, not the 2848. Goldberg also testified that he never requested the client's written permission to sign tax returns, which contradicted his assertion that he had a signed 2848 POA from the Debtor. The court also noted that Leaver, Debtor's expert witness, testified that the copy of the 2848 POA Goldberg provided was most likely manipulated either by computer or cut-and-paste because there were line-quality faults that indicated either simulation or tracing as well as a visible gap in the signature line. Between the two expert document examiners, the court found Leaver's testimony more persuasive and his document examination more extensive than Goldberg's expert, Klekoda-Baker.

In regards to the Tax Affidavit, the court noted the conflicting testimony of Goldberg's employees. Parmelee testified

-44-

that he witnessed Debtor sign the Tax Affidavit. However, Allen testified that Parmelee was not in the room when the Debtor signed it. The court also noted that Goldberg's expert witness, Klekoda-Baker, could not conclusively substantiate Debtor's signature on the Tax Affidavit because she did not have any "known" signatures with which to compare, although this did not prevent her from forming the opinion that every other purported signature of Debtor's was authentic, except for the signature on her Tax Returns, which Goldberg admitted he signed. Similarly, Parmelee testified he observed Debtor sign the Tax Affidavit and notarized the document, yet he was unable to produce a notary journal supporting his assertion because he does not maintain one. The court also found that Parmelee had failed to ask Debtor for her identification or to ask a witness to verify her identity.

We conclude that the bankruptcy court's findings are not illogical, implausible or without support in the record. If the bankruptcy court's "account of the evidence is plausible in light of the record viewed in its entirety," we may not reverse, even if we are convinced that, had we been in the position of fact finder, we would have weighed the evidence differently. Anderson, 470 U.S. at 573-74. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id.

Accordingly, we AFFIRM the Sanctions Order.

**B.    The bankruptcy court did not abuse its discretion when it entered the Fee Order.**

Goldberg argues that the bankruptcy court erroneously awarded Debtor her attorney fees. We disagree. Bankruptcy courts have

-45-

broad discretion when determining sanctions, and sanctions involving the award of attorney fees are appropriate and reasonable. The First Circuit Bankruptcy Appellate Panel affirmed a bankruptcy court's order of sanctions in the amount of three times the lawyer's fee, where the lawyer blamed the client for inconsistent and inaccurate information on the schedules and petitions. Lafayette v. Collins (In re Withrow), 405 B.R. 505, 514 (1st Cir. BAP 2009). Likewise, this Panel affirmed a $20,000 sanction for the trustee's costs and fees in bringing a motion under § 707(b)(4) and Rule 9011 after finding an "egregious" failure to list a promissory note payable to the debtor on the petition. In re Kayne, 453 B.R. at 385.

Goldberg objected to the attorney's fees requested by Debtor's counsel on the grounds that the $300 hourly rate charged by both attorneys was unreasonable, and that the number of hours billed by each attorney was excessive.[13] In support, Goldberg provided an affidavit of an experienced local bankruptcy attorney who charges $250 per hour. Goldberg argued that Debtor's attorneys had less bankruptcy experience, and therefore should not have charged $300 per hour.

The bankruptcy court rejected Goldberg's assertion that Debtor's counsel's hourly rate was excessive. First, the court determined that lawyers have great discretion when determining an hourly rate. Secondly, the court found that Goldberg's hourly

---

[13] Goldberg did not object to the award of costs.

rate was $307.50 per hour,[14] which was approximately the same billable rate that Debtor's attorneys were charging. We also note Goldberg testified that this is the same rate he charges his clients for tax work.[15] The court further found that Debtor's counsel demonstrated the skill and ability required to properly present the Sanctions Motion, and substantially achieved the result sought by Debtor. Based on its findings, the court found the rate charged by Debtor's counsel to be reasonable.

As to the number of hours charged, the bankruptcy court carefully reviewed the statements provided by Debtor's counsel and analyzed the reasonableness of the hours and costs requested by each attorney. As shown in the Fee Order, the court rejected fees for entries it found were duplicative, or lacked contemporaneity, specificity or reliability. Consequently, the court reduced counsels' fees accordingly: one attorney's fees were reduced by $26,190, the other's by $2,050.

On this record, we conclude that the bankruptcy court's award of attorney's fees was not illogical, implausible or without support in the record, and we AFFIRM the Fee Order.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM.

---

[14] The court divided Goldberg's customary charge by sixteen hours — the number of hours Goldberg stated he spent on a typical bankruptcy — arriving at an hourly fee of $307.50 per hour.

[15] Given Goldberg's admitted lack of research and compliance with tax issues, while still charging $300 per hour, his assertion that the same rate charged by Debtor's counsel was unreasonable appears unfounded and without merit.